**Victoria de la MATA, Plaintiff,**

v.

**AMERICAN LIFE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 90–173 MMS.**

United States District Court, D. Delaware.

Aug. 8, 1991.

Victor F. Battaglia of Biggs & Battaglia, Wilmington, Del. (Martin E. Karlinsky of Scheffler Karlinsky & Stein, New York City, of counsel), for plaintiff.

Frederick W. Iobst and Melanie K. Sharp of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

Plaintiff Victoria de la Mata Mendoza seeks (a) the recognition and enforcement of a Bolivian money judgment against defendant American Life Insurance Company ("ALICO") and (b) punitive damages for defendant's alleged bad faith refusal to provide payments under certain insurance policies. Currently before the court are (a) cross summary judgment motions on the

recognition claim and (b) defendant's motion for summary judgment on the bad faith refusal claim. The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). For reasons which follow, ALICO's summary judgment will be granted on the recognition claim and its summary judgment motion on plaintiff's bad faith refusal claim will be denied as moot.

## I. Background

ALICO is a Delaware life insurance company which, *inter alia,* engages in the insurance business throughout Latin America. According to a notarized certificate from the Bolivian Registry of Commerce, ALICO registered to conduct business transactions in Republic of Bolivia in 1982.[1] The plaintiff is a Bolivian citizen and resident and the widow of Eduardo de la Mata (the "deceased").

In 1982, the deceased purchased four insurance policies from Alfredo Aviles, an ALICO insurance agent in Santa Cruz, Bolivia.[2] The four insurance policies were (a) a $200,000 personal accident insurance policy, numbered 8469780–7200133 [3] with the deceased's father as beneficiary; (b) two endowment policies, numbered 0882140 and 0882142, each to provide $50,000 to one of the deceased's two children upon their eighteenth birthday [4]; and (c) a $100,000 whole life insurance policy, numbered 0882141 on the life of the deceased with the deceased's children as beneficiaries.

The whole life policy and the accidental death policy contain provisions excluding payment in the event of the insured's suicide. The whole life insurance policy reportedly included a provision excluding payment in the event of the insured's death by suicide within two years of the date of the purchase of that policy.[5] Part D of the supplementary contract attached to the personal accident policy excludes payment "for injury intentionally self-inflicted, suicide or any attempt to commit suicide, be it in a state of sanity or of insanity...."

On March 19, 1985, the personal accident policy allegedly lapsed because of the deceased's failure to pay the premium due in February. The endowment policies and whole life policies also had allegedly lapsed around the same time, but ALICO reinstated these three policies following late receipt of the premiums. ALICO contends that the whole life policy's two-year exclusion for suicide was triggered anew because of the reinstatement.

On May 8, 1985, the deceased died of a massive brain hemorrhage caused by the discharge of a firearm. The medical reports submitted to ALICO indicate that the bullet entered the upper palate of the deceased's mouth and exited the occipital region at the back of the skull. Apparently, a coroner's report prepared on May 14, 1985 identified the wounds of the deceased but failed to state the obvious, namely that the deceased had taken his own life.[6]

On May 30, 1985, Aviles informed ALICO of the death of the deceased. The plaintiff also wrote a letter to ALICO on June 8, 1985, seeking payment under the whole life policy and the two endowment policies. In a form dated on July 17, 1985, the plaintiff requested payment on all four policies purchased by the deceased. One form, submitted with the plaintiff's signature, identified the cause of her spouse's death as "auto-elimancion" or suicide.

---

1. Many civil law countries have a state organ like the Registry of Commerce. Commercial companies or merchants are required to register and declare the nature of their business activities.

2. ALICO maintained an agency relationship with Aviles until April 1985. *See* Fernandez Affidavit, Exh. C of Dkt. 44. However, it appears from the record that during the summer of 1985, Aviles performed several administrative tasks for clients who purchased ALICO policies.

3. The final seven digits of the policy number were frequently omitted in ALICO correspon-

dence and documents filed with the Bolivian courts.

4. Payment under the endowment policies was not contingent upon the death of the deceased.

5. ALICO has not provided the court with a copy of the whole life policy.

6. The coroner's report was not contained in the record because it was not available and possibly lost by the Bolivian authorities.

ALICO denied the claims because (a) the endowment policies for the deceased's children only provide payments when the insureds reach the age of eighteen; (b) the personal accident policy had lapsed two months before the deceased's death, and notwithstanding the lapse, the policy excludes payment in the event of death by suicide; and (c) the two-year exclusion for suicide under the whole life insurance policy was applicable because the policy had been reinstated after late payment of premiums.

The plaintiff apparently continued in her attempts to collect payments under the whole life insurance policy. However, the record does not set forth documents detailing the course or contents of these contacts. In December 1986, the plaintiff executed a "Renuncia a Todos Reclamacion," or a "Waiver as to All Claims" (the "Waiver"), against ALICO arising from the whole life insurance policy in exchange for $5,742, an amount representing the cash reserve value of that policy.

On September 10, 1988, the plaintiff through Bolivian counsel prepared a complaint against ALICO and presumably Aviles, seeking payment under the two endowment policies, each in the amount of $50,000 and the personal accident policy in the amount of $200,000. In a rather unclear paragraph of the complaint, plaintiff alleged that Aviles charged her $250 for advice which she deems "fraudulent and dishonest" and which persuaded her to accept that her husband's death was attributable to suicide.

On September 13, 1988, the complaint was filed in the Superior Court of the Judicial District of Santa Cruz (the "Superior Court"), which forwarded the complaint to the Second Ordinary Court for Civil Matters in the Judicial District of Santa Cruz

(the "District Court") for processing in the first instance on September 17, 1988. The complaint requested an "executory proceeding." In Bolivia, an executory proceeding is an expedited statutory procedure used for commercial disputes. A plaintiff may elect to use an executory proceeding where (a) he holds a title capable of execution, (b) he has asked his debtor to comply with its obligations, and (c) the debtor delays in meeting the obligation.[7] *See* Article 486 of the Code of Civil Procedure of Bolivia.

On September 23, 1988, the district judge authorized the plaintiff's writ of payment against ALICO in the person of its representative Aviles, her writ of attachment and her official notice of the complaint to ALICO. On the same day, the district judge, pending reply by ALICO, ordered a prejudgment attachment of ALICO's property as requested by the plaintiff.

On September 29, 1988, notice of the plaintiff's complaint was personally served on Aviles as a representative of ALICO, even though Aviles' agency relationship with ALICO had ended three years earlier. Under Article 509 of the Code of Civil Procedure of Bolivia, ALICO had five days to respond to the complaint. As the court did not receive a response in the required five day-period ending on October 4, the plaintiff requested a default judgment on October 5, 1988. On the same day, Aviles submitted a brief to the District Court, contending that he lacked authority to represent ALICO since he no longer worked for it.[8]

On October 7, the district judge granted judgment in the amount of $300,000 along with $30,000 in statutory attorney's fees. The basis for this decision was (a) the documents submitted by the plaintiff establish the plaintiff's right of payment under the

---

**7.** Executory procedure is found in many civil law countries. It relies on principally documentary, as opposed to *viva voce*, proof. Civil law courts will permit an executory proceeding when there are no triable issues of fact and the obligations of the parties are solely evidenced by instruments. Apparently, the goal is to give the creditor the opportunity to receive payment as quickly as possible. Executory proceedings are to be contrasted with "ordinary" proceed-

ings, which permit evidence beyond the documents which indicate a title capable of execution. *See* Articles 327 & 334 and Articles 486–490 of the Code of Civil Procedure.

**8.** In his brief, Aviles also claimed that ALICO had withdrawn from conducting business in Santa Cruz, and possibly from Bolivia entirely.

insurance policy, and (b) ALICO had not filed "exceptions which could have favored them" despite being notified by the complaint and writ of payment.[9] The judgment does not refer to Aviles' assertion of lack of legal capacity.

In the judgment, the district judge ruled Aviles would be obliged to pay the owed sum on behalf of ALICO. Galvanized by the thought of personal liability, or perhaps a stretch in a Bolivian prison, Aviles telexed Bruce Dozier of the Wilmington office of ALICO on October 10. The following telex was the first time ALICO received notice of the executory proceeding which had just been concluded before the District Court:

> The widow of de la Mata policies numbers 8469780 & 0882140-1-2 has demanded to the company y Alfredo Aviles in the local court of justice y the judge gave the verdict against the company due the fault of proof stop I get a lowyer to defend the company. Send money also a telex indicated that Aviles is not working for ALICO since 1984. On the contrary, I will go to the jail. Need protection & take me out from Bolivia. Give orders what to do in this case. [Errors not corrected.]

On October 12, Dozier responded to this cry for help:

> Today I referred your October 10 telex to M. Astaburuaga for review. Please supply Mr. Astaburuaga any facts you believe pertinent to his review of your request.

The record does not indicate any subsequent correspondence between Aviles and ALICO.

Most likely out of fear for his own liberty and financial security, Aviles took matters into his own hands. On October 17, he filed an appeal with the Bolivian Superior Court, arguing (a) the three-year limitation that the insurance policies impose for bringing a claim had run, and (b) ALICO is under no obligation to pay benefits under the insurance policy because of the deceased's death by suicide. Sometime after filing this appeal, Aviles left the stage. Neither ALICO nor the plaintiff have any information about his current whereabouts.

On January 29, 1989[10], the plaintiff filed her answer to the appeal. She argued (a) ALICO never replied to her June 18, 1985 demand for payment under all four policies[11], (b) Articles 1041 and 1043 of the Bolivian Commercial Code impose a five-year statute of limitations which cannot be abridged by contractual agreement for claims arising from personal accidents or claims by life insurance beneficiaries, (c) the medical reports do not state that the cause of death was suicide and the entry and exit wounds of the bullet alone do not establish that the deceased exhibited the volition necessary to deem the death a suicide, and (d) ALICO did not contemporaneously object to the conclusion of the corner's report that death was from a gunshot wound in the mouth and not from suicide.

On May 26, 1989, the Superior Court affirmed the judgment of the District Court. The facts as stated in the judgment were as follows: (a) Aviles filed an appeal as the legal representative of ALICO; (b) the plaintiff had a power of attorney from her father-in-law and a declaration of heirship that gave her guardianship over the two children[12]; (c) the attached documentation met the requirements for an executory proceeding and for the plaintiff's writ of payment under Article 491 of the Code of Civil Procedure; (d) the writ was duly served on ALICO on September 29, 1988;

---

**9.** In the decision of the Superior Court, it is stated that the district court rejected Aviles' exceptions because they were not timely filed.

**10.** The record does not indicate any activity on the part of the parties or the court during the intervening three months.

**11.** The complaint only identified the two endowment policies and the personal accident policy as the basis for plaintiff's claim. It is unclear how the whole life policy, which was not a source of plaintiff's claim in the District Court which rendered the default judgment against ALICO, became a basis for her claim on appeal to the Superior Court.

**12.** By virtue of these documents, the plaintiff could assert this claim on behalf of her father-in-law and children.

and (e) ALICO let the five-day period allowed under Article 509 of the Code of Civil Procedure to pass without filing defenses. Specifically, the Superior Court found that (a) the district judge properly disregarded Aviles' argument of lack of legal capacity as per Articles 507 and 509 of the Code of Civil Procedure, which deal with the timely filing of exceptions; (b) notwithstanding the foregoing, by filing the exception before the District Court and the appeal to the Superior Court, Aviles assumed the position of official legal representative of ALICO; (c) Article 1041 of the Commercial Code establishes a five-year limitation period for insurance claims, and Article 1043 extends that five-year period to all contracts; and (d) ALICO's inaction was tacit acceptance of the coroner's report.

In the event that ALICO wished to contest the appellate decision, two avenues were available. First, within thirty days of the issuance of the writ of execution, it could have petitioned the appellate court to order an "ordinary proceeding" in the District Court where ALICO could have presented *viva voce* evidence and argued the case *de novo*. Second, it could have brought an appeal with the Bolivian Supreme Court in La Paz. Neither alternative was pursued.

On June 20, 1989, the Superior Court remanded the complete record to the District Court as neither party contested the judgment. On July 25, 1989, the Superior Court certified that ALICO had not initiated an ordinary procedure and that, as a consequence, the District Court's judgment on October 7, 1988 is *res judicata*. Finally, on August 2, 1989, the District Court issued an "Expediente de Exhorto" or letters rogatory to enforce the judgment in Delaware.

II. Analysis

   A.  Cross Summary Judgment Motions on the Recognition of the Bolivian Judgment

█ A foreign judgment must first be recognized and reduced to a judgment in the enforcing United States court. Recognition occurs when a United States court finds that a matter has been decided by a foreign court in the judgment and does not need to be further litigated in a United States court. "A foreign judgment is enforced when a party is accorded part or all of the relief to which the judgment entitles him." *See* von Mehren, "Enforcement of Foreign Judgments in the United States," 17 Va.J.Int. Law 401 (1977). Thereafter the judgment may be enforced by any means available under local law.

█ United States courts will recognize foreign judgments under the doctrine of comity, as contrasted to any constitutional requirement such as affording full faith and credit to the judgments of the courts of sister states. *See Aetna Life Insurance Co. v. Tremblay*, 223 U.S. 185, 190, 32 S.Ct. 309, 310, 56 L.Ed. 398 (1912) ("The first section of Article IV of the Constitution confers the right to have full faith and credit 'given in each state to the public acts, records and judicial proceedings in every other state.' No such right, privilege or immunity, however, is conferred by the Constitution or by any statute of the United States in respect to the judgments of foreign states or nations...").

The Third Circuit Court of Appeals has described the doctrine of comity as follows:

Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience and expediency. Although more than mere courtesy and accommodation, comity does not achieve force of imperative or obligation. Rather it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.

*Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972).

This court has had occasion to elaborate upon this principle as well:

> [A]n American court will under the principles of international comity recognize a judgment of a foreign nation if it is convinced that the parties in the foreign court received fair treatment by a court of competent jurisdiction "under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries...."

*Pilkington Brothers P.L.C. v. AFG Industries, Inc.*, 581 F.Supp. 1039, 1043 (D.Del. 1984) (citations omitted).

The Third Circuit Court of Appeals has instructed that the law of the state where recognition is sought should be applied in determining whether to recognize a foreign judgment. *See Somportex, supra, Pilkington Bros., supra.* Delaware's jurisprudential landscape does not contain many precedents with respect to the recognition of foreign judgments. In *Bata v. Hill,* 37 Del.Ch. 96, 139 A.2d 159 (Del.Ch.1958), then-Chancellor Seitz opined that Delaware would not follow dictum enunciated in *Pritchett v. Clark,* 3 Har. 517, 523–524 (Del.Super.Ct.1842), suggesting a foreign judgment is only prima facie evidence of an obligation and the merits underlying the judgment may be re-examined.[13]

On appeal, in *Bata v. Bata,* 39 Del.Ch. 258, 163 A.2d 493, 503 (Del.1960), *cert. denied,* 366 U.S. 964, 81 S.Ct. 1926, 6 L.Ed.2d 1255 (1961), the Delaware Supreme Court confirmed Chancellor Seitz's observation:

> [w]e entertain no doubt that a foreign judgment, given by a court under a system of law reasonably insuring notice and hearing ... is *res judicata* in Delaware, despite a dictum to the contrary in an early Delaware case. *See Hilton v. Guyot,* 159 U.S. 113 [16 S.Ct. 139, 40 L.Ed. 95] (1895),....

Since the Delaware Supreme Court referred to *Hilton,* the court will look to that case for guidance on when a foreign judgment may be recognized in Delaware. *Hilton* articulates the requisite criteria for a finding of comity to permit the recognition and enforcement of a foreign judgment. Summarized the criteria are:

1. Opportunity for a full and fair trial

2. Trial before a court of competent jurisdiction

3. Proceedings following due citation or voluntary appearance of adversary parties

4. Trial conducted upon regular proceedings

5. Trial under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries

6. No evidence to demonstrate

   a. fraud in the procuring of the judgment

   b. prejudice in the system of laws in which the court was sitting

   c. prejudice in the court

   d. any other special reason why comity of the United States should not allow full effect.

*Id.* at 202–203, 16 S.Ct. at 158–159. *See also Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 302 (3d Cir.) (Adams, J., concurring and dissenting), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972).

These criteria, however, do not end the analysis for the recognition of a foreign judgment. *Hilton* also holds that reciprocity with regard to the conclusiveness afforded a United States judgment in a foreign country is required before a judgment of that foreign country's court will be conclusively recognized by a United States court.

---

**13.** The dictum from the Superior Court in *Pritchett* states:

Independently of the constitution and laws of the United States, it is not disputed that the judgments of the several states would be regarded only in light of foreign judgments by the tribunals of any other state, and would be, at most, only prima facie evidence of the debt or promise. The merits would be fully open to examination on a plea of the general issue, which would be nil nebet or non-assumpsit, and not nul tiel record.

### 1. Reciprocity

Following *Hilton*, Delaware courts have reluctantly required a demonstration of reciprocity as a condition precedent to the enforcement of a foreign judgment. In *Bata v. Bata, supra*, 163 A.2d at 504, the Delaware Supreme Court noted that it had established this requirement in *DuPont v. DuPont*, 47 Del. 231, 237, 90 A.2d 468, 471 (Del.), *cert. denied*, 344 U.S. 836, 73 S.Ct. 46, 97 L.Ed. 651 (1952). Notwithstanding that observation, the Court sought to limit the requirement, commenting that the rule had been severely criticized by commentators and abandoned in New York. The Court explained that the reciprocity requirement announced in *Hilton* was "based on the desire to protect American nationals" and was "limited to cases in which it is invoked by an American citizen." *Id.* 163 A.2d at 505. The Court refused to apply the rule in *Bata* since that action was brought by foreign citizens.

Twenty-four years later, this court also declined to apply the Delaware reciprocity rule in *Pilkington Brothers, supra*, where both a foreign corporation and a domestic corporation sought its protection. The court predicted "Delaware would reject application of the reciprocity doctrine in this case ..." based on the Delaware Supreme Court's criticism of the rule in *Bata*, New York precedent abandoning the rule, scholarly commentary sharply critical of the doctrine, and the Third Circuit appellate court's opinion in *Somportex*, which observed that the reciprocity rule has "received no more than desultory acknowledgement." *Id.*, at 1044, quoting, *Somportex* at 440, n. 8.

■ ALICO, a domestic corporation, seeks to assert the rule for its protection, thereby falling outside of the exception established in *Bata*. Nevertheless, I am of the opinion that the Delaware Supreme Court would abandon the reciprocity rule. Courts and commentators have almost universally rejected or ignored the doctrine that reciprocity should be required as a precondition to the recognition and enforcement of a foreign country's judgment. One of the earliest cases that expressly rejected the *Hilton* reciprocity requirement was *Johnston v. Compagnie Generale Transatlantique*, 242 N.Y. 381, 152 N.E. 121 (N.Y.1926), which is still followed by New York courts today. The *Somportex* court's description of the rule as receiving only "desultory acknowledgement" further suggests a weakened viability of the rule in this circuit. Section 98 of the Restatement (Second) of the Conflicts of Laws does not require reciprocity. Further, in *Bank of Montreal v. Kough*, 612 F.2d 467, 471–72 (9th Cir.1980), the Ninth Circuit Court of Appeals noted that the drafters of the Uniform Foreign Money Judgment Recognition Act (the "Uniform Act") "consciously rejected reciprocity as a factor to be considered in recognition of foreign money judgments, apparently on the ground that due process concepts embodied in the Act were an adequate safeguard for the rights of citizens sued on judgments obtained abroad." [14] Eighteen states, including California, New York, Illinois, Maryland and Connecticut, have adopted the Uniform Act, and Minnesota and North Dakota have judicially incorporated its provisions.[15]

The opinion of the Minnesota Supreme Court in *Nicol v. Tanner*, 310 Minn. 68, 256 N.W.2d 796 (Minn.1976), is a persuasive and well-reasoned discussion of the shortcomings of reciprocity:

> *Hilton* has been severely and consistently criticized by commentators and courts. Three significant criticisms have been advanced. First, *Hilton* mandates a misplaced retaliation against judgment creditors for acts of foreign states irrelevant to their case and over which they had no control.
>
> Second, judgments are enforced to bring an end to litigation so that the rights of the parties might finally be

---

**14.** Delaware has not adopted the Uniform Act.

**15.** Few states currently require reciprocity. In its variant of the Uniform Act, Texas includes lack of reciprocity as a ground for discretionary refusal to recognize or enforce a foreign country judgment, as does Ohio. The Massachusetts and Georgia versions of the Uniform Act mandate reciprocity as a precondition.

determined and judicial energies might be conserved. These considerations are thwarted by the reciprocity requirement. The judgment of a foreign nation, when rendered in a proceeding in which the foreign court had jurisdiction and the issues were fully and fairly adjudicated, should be entitled to no less effect on policy grounds than a judgment of another state or federal court. . . .

Third, there is serious doubt that *Hilton* achieves either of its two probable goals: (1) protecting Americans abroad; and (2) encouraging foreign nations to enforce United States judgments. If protecting United States interests abroad was a goal of *Hilton,* it is clear that reciprocity does not achieve that goal because it does not look to the fairness or persuasiveness of the foreign judgment.

With respect to *Hilton's* goal of protecting Americans abroad, the Minnesota Supreme Court quoted Golomb, "Recognition of Foreign Money Judgments: A Goal–Oriented Approach," 43 St. John's L.Rev. 604, 616:

> While protecting nationals from unfair treatment abroad is a valid exclusive interest of a state, favoring nationals despite fair treatment abroad should not be commended. . . . If *Hilton* is regarded as an attempt by the Supreme Court to secure recognition for American judgments abroad, not an unreasonable state interest, the decision has not achieved its desired effect. Possibly the limited application of *Hilton* to judgments rendered against American defendants in favor of [foreign] nationals, when compared to the sweeping reciprocity policies of other nations, reduces its effectiveness as a means of persuading other states to recognize American judgments. . . . Probably more damaging, however, to the fate of American judgments abroad is that foreign nations with reciprocity rules look at *Hilton* and conclude that the United States would not recognize one of their judgments. The *Hilton* Rule then leads American courts to refuse recognition to judgments of those countries. This circularity does

not further any of the relevant goals of judgment recognition policies. It would seem that a clear renunciation of the reciprocity doctrine by American courts might be a more effective method of obtaining recognition for American judgments in many other nations.

Commentators also have concluded that reciprocity rule should be retired from our jurisprudence. *See* von Mehren; "Enforcement of Foreign Awards in the United States," 17 Va.J. Int'l L. 401 (1977); Comment, "The Reciprocity Rule and Enforcement of Foreign Judgments," 16 Colum.J. Transnat'l L. 327 (1977); Carl, "Recognition of Foreign Judgments—And Vice Versa," 13 Hous.L.Rev. 680 (1976); Peterson, "Foreign Country Judgments and the Second Restatement of Conflicts of Laws," 72 Colum.L.Rev. 220 (1972); von Mehren & Trautman, "Recognition of Foreign Adjudications: A Survey and a Suggested Approach," 81 Harv.L.Rev. 1601 (1968).

In light of the foregoing, the court predicts that the Delaware Supreme Court would no longer regard reciprocity as a precondition for the recognition of a foreign judgment. As a consequence, the plaintiff is not required to demonstrate reciprocity on the part of Bolivian courts.

### 2. Trial Before a Court of Competent Jurisdiction

As a precondition to recognition, the court must ascertain whether the Bolivian courts possessed subject matter and personal jurisdiction in this case. ALICO concedes the Bolivian courts had subject matter jurisdiction. More difficult is the issue of the Bolivian court's personal jurisdiction over ALICO. "It is clearly established that in order to grant comity to a foreign court's award of a money judgment against a defendant, the foreign court must have valid personal jurisdiction over the defendant." *Cunard S.S. Co. v. Salen Reefer Services, A.B.,* 773 F.2d 452, 457 (2d Cir. 1985).

American writers agree that our own courts "require for recognition of the legal effect of foreign judicial proceedings that the foreign courts have jurisdiction, not as

measured by the standards abroad but as measured by their own conception of what falls within the scope of permissible exercise of judicial power." G. Stumberg, *Conflicts of Law*, 66–67 (3d ed. 1963). *See also* Reese, "The Status in This Country of Judgments Rendered Abroad," 50 Colum.L.Rev. 783 (1950). Likewise, federal courts have held that the issue of whether a foreign court had jurisdiction over a United states national should be determined by our own standards of judicial power as promulgated by the Supreme Court under the due process clause of the Fourteenth Amendment. *See Koster v. Automark Industries, Inc.*, 640 F.2d 77 (7th Cir.1981); *Somportex, supra; Bank of Montreal v. Kough, supra; South Carolina National Bank v. Westpac Banking Corp.*, 678 F.Supp. 596 (D.S.C.1987); *Oman International Finance, Ltd. v. Hoiyong Gems, Corp.*, 616 F.Supp. 351 (D.R.I.1985); *Ackermann v. Levine*, 610 F.Supp. 633 (S.D.N.Y.1985), *aff'd in part and rev'd in part*, 788 F.2d 830 (2d Cir.1986); *Hunt v. BP Exploration Co. (Libya) Ltd.*, 492 F.Supp. 885 (N.D.Tex.1980); *Royal Bank of Canada v. Trentham Corp.*, 491 F.Supp. 404 (S.D.Tex.1980); *Cherun v. Frishman*, 236 F.Supp 292 (D.D.C.1964).

■ Due process requires that a judgment is not valid if the contacts between the defendant and the forum where judgment was rendered were insufficient to require defense of the action as a matter of fairness. *Milliken v. Meyer*, 311 U.S. 457, 463–64, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940). Before a court may exercise personal jurisdiction over a defendant, there must exist sufficient "minimum contacts" between the defendant and the forum. *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). In *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980), the Supreme Court explained that the concept of minimum contacts serves the purpose of protecting a defendant from the burden of defending in a forum which is unreasonable because the defendant had little or no contact with it.

Of central relevance to the existence of sufficient minimum contacts is the degree to which the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

■ The requirement of sufficient minimum contacts with the forum state is satisfied in this case, and as a consequence, ALICO was amenable to personal jurisdiction in the Bolivian courts. ALICO registered with the Bolivian Registry of Commerce and engaged in the business of selling insurance policies in Bolivia. The certificate from the Registry of Commerce reveals that ALICO at one time appointed a legal representative in Bolivia and that appointment had not been revoked as late as 1990. From 1982 until 1985, ALICO maintained at the very least one Bolivian insurance agent, Aviles, who sold insurance policies on behalf of ALICO. ALICO was responsible for payment to at least two Bolivian beneficiaries if the terms for payment under the whole life policy were met.[16] According to the certificate from the Registry of Commerce, ALICO had at one time in the 1980's a headquarters for its Bolivian operations in La Paz. Given the preceding undisputed contacts of ALICO with Bolivia, it would not be unfair or unreasonable to require ALICO to appear and defend in Bolivia against the plaintiff.

ALICO maintained more substantial contacts with Bolivia than did the nonresident defendant in *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), where the Supreme Court approved the exercise of personal jurisdiction over the defendant insurance company which had only one contact with the forum, namely the mailing of an offer of reinsurance to a resident of that forum.

**16.** The beneficiary of the personal accident policy, the deceased's father, was a citizen and resident of Argentina.

The Court opined that the forum had a manifest interest in providing a means of effective redress for its residents when their insurers refuse to pay claims. It cannot be argued that Bolivia's interest is any less manifest.

Similarly, in *Somportex*, a United States defendant corporation argued that its contacts with the United Kingdom were insufficient to permit the British High Court from asserting personal jurisdiction. The defendant claimed that it maintained "no office or employee in England and transacts no business within that country." The Third Circuit Court of Appeals, nevertheless, held that sufficient contacts were demonstrated by contract negotiations conducted on the defendant's behalf by an "independent New York exporter," who arguably was either an independent contractor or defendant's agent. Clearly, ALICO's contacts with Bolivia are more substantial than the defendant's contacts with England in *Somportex.*

The court concludes that the exercise of personal jurisdiction by the Bolivian courts over ALICO comports with United States notions of due process because ALICO had sufficient minimum contacts with Bolivia.

3. Proceedings Following Due Citation or Voluntary Appearance of Adversary Parties/Opportunity for a Full and Fair Trial

Having concluded that the Bolivian courts could, consonant with restrictions of due process, exercise personal jurisdiction over ALICO, the court is required to examine whether the Bolivian court's exercise of that power by way of the plaintiff's selected means of service comports with due process.

Analysis begins by examining the law governing service in Bolivia and determining whether the Bolivian court adhered to Bolivian laws. *See Royal Bank of Canada, supra; Ackermann v. Levine, supra.* In the case at hand, the parties strenuously contest whether service upon Aviles constitutes valid service of process on ALICO as a matter of Bolivian law.

Article 421 of the Commercial Code addresses service of process on companies incorporated outside of Bolivia. The Article provides:

The notice and summons in a lawsuit to a foreign corporation can be validly served in the Republic:

(1) On the person of the agent who supervised an act or contract, which is the basis of the litigation, when it relates to an isolated act;

(2) On the person of a permanent representative, when it relates to a branch for the habitual exercise of acts of commerce.

The plaintiff through its expert asserts that service was validly made upon Aviles because he was the agent who supervised the sale of the insurance policies which form the basis of the Bolivian litigation. The defendant through its expert rejoins that the sale of the insurance policies was not an isolated act undertaken by ALICO. Rather, at the time of the Bolivian litigation, ALICO maintained a branch in Bolivia for the habitual exercise of business. As a consequence, Ruiz, ALICO's representative registered with the Registry of Commerce, is the sole valid agent for service of process purposes.

ALICO draws further support from Article 56 of the Code of Civil Procedure. That Article provides that legal entities, including business companies, must be served by service on their "legal representatives" at the time of service. Such legal representatives are identified by the records from the Registry of Commerce.[17] As Aviles was never registered with the Registry, he cannot be regarded as a legal representative. Needless to say, plaintiff's expert disagrees with this and other positions advanced by ALICO.

ALICO also attempts to establish the invalidity of service by reference to the Bolivian Civil Code requirements that a specific power of attorney, embodied in a public deed, is required to empower an

17. Articles 27, 29(5), 76 and 420 of the Commercial Code.

agent to appear in a judicial proceeding.[18] As the record of the Bolivian proceedings does not disclose a power of attorney. issued in the prescribed form by ALICO in favor of Aviles, ALICO maintains Aviles never acquired the legal capacity to represent it, and as a consequence, service was not valid.

Notwithstanding the foregoing arguments, it remains undisputed that the Superior Court held that Aviles assumed the position of legal representative of ALICO by reason of his having answered the complaint and filed the appeal. By implication, Aviles was an agent for service of process for Bolivian law purposes. In pertinent part, the Superior Court held:

CONSIDERING: That from the meticulous study of the process, the following is established: That it is not permitted in the ordinary remedy of appeal, to claim what it could have done during the instance, by means of the exceptions which Article 507 indicates in the term which Article 509 fixes, both of the Code of Civil Procedure, Therefore it is not up to the Court of Appeals to go ahead and analize what was not questioned in time.—That, with all the more reason, it is evident that Alfredo Koya Aviles, upon filing exception of lack of legal capacity inopportunely and then make use of the ordinary remedy of appeal, he assumes legal capacity in the name and representation of the executed entity; that is to say, he admits to be the legal official representative of the executed entity....

See Dkt. 34A at PA—203 (errors not corrected).

The court understands the quotation to mean that notwithstanding Aviles' being precluded from arguing the capacity issue because of the untimely filing of his exception with the District Court, Aviles nonetheless assumed legal capacity to represent ALICO because he filed exceptions in the District Court and an appeal in the Superior Court. The Superior Court's reasoning appears to be that any person who files exceptions or an appeal in litigation on behalf of a defendant automatically assumes the status of the legal representative of the defendant. The Superior Court is vague as to the source of authority for this holding, which arguably may have been premised on a statutory basis, Article 421(1) of the Code of Civil Procedure, or upon some other source.

■ Confronted with an unknown basis for the Bolivian courts' conclusion that there was valid service of process and opinions of diametrically opposed experts, the court opts to be guided by the Bolivian court, particularly since one expert has opined on a theoretical bases to support that court's holding. The Delaware Federal District Court does not sit as an appellate court over the Superior Court for the Judicial District of Santa Cruz to correct its alleged errors of Bolivian law. The court is satisfied that for purposes of this case process was validly served as a matter of Bolivian law on ALICO in the person of Aviles.

■ A determination that there was valid service of process under Bolivian law does not end the analysis. The court must also determine whether service of process under a foreign country's laws comports with traditional American notions of due process. *See Koster v. Automark Industries,* 640 F.2d at 81, n. 3; *Ma v. Continental Bank, N.A.,* 905 F.2d 1073, 1076 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 430, 112 L.Ed.2d 414 (1990); *Bank of Montreal, supra,* at 470–71; *Boivin v. Talcott,* 102 F.Supp. 979 (N.D.Ohio 1951).

The Supreme Court has held "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is *notice reasonably calculated, under all the circumstances,* to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (emphasis added).

**18.** Article 58 of the Code of Civil Procedure, Articles 834–35 of the Civil Code; Article 3 of the Notarial Law of 1858.

[W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, compare *Hess v. Pawloski*, 274 U.S. 352 [47 S.Ct. 632, 71 L.Ed. 1091 (1927)], with *Wuchter v. Pizzutti*, 276 U.S. 13 [48 S.Ct. 259, 72 L.Ed. 446 (1928)], or when conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes. *Id.* at 315, 70 S.Ct. at 657–658. *See also Somportex, supra,* at 443 (within the context of a default judgment, the central issue is "whether a reasonable method of notification is employed and reasonable opportunity to be heard is afforded to the person affected"); *Bata, supra,* 163 A.2d at 503 (a system of law "reasonably insuring notice" as a precondition to recognition).

■ The record indicates that ALICO did not receive any notice of the executory proceeding until after the default judgment has been obtained. The plaintiff, however, argues that service upon Aviles yielded actual notice to ALICO because of the implicit holding of the Superior Court that Aviles was a proper agent for service of process.

There are several serious defects with this argument. Aviles' agency relationship with ALICO had ended more than three years before the plaintiff initiated the executory proceeding. Hence, Aviles was no longer under any contractual obligations to his former principal. In this circumstance, service of process upon a former agent cannot be deemed service reasonably calculated to ensure actual notice to the former principal because the former agent is no longer under a duty to uphold and protect the interests of his former principal. The passage of time may further diminish any incentive to assist the former employer. Because the agent's duties to his former

principal are extinguished, it is not reasonably probable that service on Aviles, the former agent, would yield actual notice to ALICO. In fact, in this case, ALICO only learned of the pending Bolivian litigation by the pure happenstance of Aviles' plea for protection.

In *Wuchter, supra,* the United States Supreme Court held the legal basis for service of process must be reasonably probable to ensure that the defendant will receive actual notice. *Wuchter* involved a state long-arm statute that authorized service upon the secretary of state as statutory agent for a nonresident defendant. The infirmity with the long arm statute was that it did not mandate that the Secretary of State provide the defendant with the summons. The fact that the defendant did actually receive a copy of the summons in the mail failed to cure the defect since the legal basis for service did not ensure the reasonable probability of actual notice.

Research has revealed two foreign recognition cases with factual backgrounds similar to *Wuchter.* In *Koster v. Automark Industries, supra,* at 81 n. 3, the Seventh Circuit appellate court examined a Dutch long-arm statute which provided that foreign defendants should be notified by serving process on the Dutch Department of Foreign Affairs. The Dutch statute, as it appeared on the record, contained no provision for serving or advising the foreign defendant of suit instituted against it. The Seventh Circuit Court of Appeals concluded that the Dutch statute is not reasonably calculated to provide notice unless it contains mandatory terms relating to the sending of notice to the defendant. While the Department of Foreign Affairs may exercise its discretion to serve process in some reasonable manner, this was held not dispositive since "the right of a citizen of due process of law must rest upon a basis more substantial than favor or discretion." *Id.* quoting *Roller v. Holly,* 176 U.S. 398, 409, 20 S.Ct. 410, 414, 44 L.Ed. 520 (1900).

In *Boivin v. Talcott,* 102 F.Supp. 979 (N.D.Ohio 1951), the district court refused to enforce a Quebec default judgment where the foreign defendant received actu-

al notice. Service of process was directed by the Quebec court, but the Quebec statute did not contain a mandatory provision ensuring service of process.

ALICO's receipt of actual notice of the Bolivian proceeding was completely dependent upon Aviles' "favor or discretion" since he no longer was under a duty to do anything for ALICO. Where, as here, Aviles was ALICO's agent for service of process purposes under Bolivian law, but not American law, and there was no Bolivian statutory framework for assuring ALICO timely knowledge of litigation by plaintiff, it is held service upon Aviles was not "notice reasonably calculated under all the circumstances" to apprise ALICO of the pendency of the lawsuit and to provide a concomitant opportunity to defend.

Lastly, the plaintiff analogizes ALICO to the defendant in *Somportex, supra.* In that case, an English plaintiff commenced an action for breach of contract against a Pennsylvania defendant in the High Court of England. The defendant had received actual notice of the proceeding and retained local solicitors, who purported to appear conditionally before the High Court for the express purpose of contesting jurisdiction. *Id.* at 437. At the hearing on this application, the defendant's solicitors advised the Master that the defendant had made a calculated decision not to press with this application and instead sought to withdraw their appearance. Leave to withdraw was granted, but the Court of Appeals, on plaintiff's appeal, reversed and held that the appearance had been unconditional and that plaintiff's consent to jurisdiction was effective. *Id.* at 437–38. The Court of Appeals offered to extend the time during which the defendant could appeal the ruling on jurisdiction and expressly reserved the defendant's ability to argue the point at a later state in the proceedings. Thereafter, the defendant made another calculated decision to do nothing with respect to the ongoing litigation. A default judgment was later rendered against the defendant, and the plaintiff brought suit in the United States to enforce the default judgment.

The Third Circuit appellate court held under the foregoing circumstances, "the defendant cannot choose its forum to test the factual basis of jurisdiction. It was given, and it waived, the opportunity of making the adequate presentation to the highest court." *Id.* at 441.

ALICO's situation is distinguishable from the factual setting of *Somportex.* Unlike the *Somportex* defendant, ALICO did not first test the waters of a foreign tribunal before effecting a strategic withdrawal and waiving its opportunity to make an adequate presentation. Further, ALICO did not receive actual notice of the litigation and purport to enter an appearance. Rather, notice of the Bolivian proceedings came to ALICO only after the default judgment was entered and then only because its former sales agent was faced with a $330,000 judgment. It never had an opportunity to challenge service of process, personal jurisdiction or Aviles' status as an agent before the executory tribunal which initially rendered a judgment against it. The plaintiff argues that ALICO could have initiated an ordinary proceeding once the default judgment had been rendered, but this would nonetheless fail to remedy the due process infirmity of the selected method of service of process. This argument in effect is that if there were actual notice, the constitutional norms for valid service of process are satisfied even if the means employed were not reasonably calculated to provide notice of the lawsuit against ALICO. The court holds purported service upon ALICO through Aviles fails to comport with American fundamental notions of due process resulting in the inability to enforce the judgment in this court.

#### 4. Fraud

According to *Hilton*, a foreign judgment is not entitled to recognition if the judgment was obtained by fraud. Courts have held that only extrinsic, as opposed to intrinsic, fraud will bar the recognition of a foreign judgment. If fraud relates to matters other than those that were litigated and was committed upon the foreign court, then it is extrinsic fraud. *See Hilton,* 159

U.S. at 207, 16 S.Ct. at 160; *John Sanderson & Co. v. Ludlow Jute Co.*, 569 F.2d 696 (1st Cir.1978); *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*, 470 F.Supp. 610, 615 (S.D.N.Y.1979); *Alleghany Corp. v. Kirby*, 218 F.Supp. 164 (S.D.N.Y.1963), *aff'd*, 333 F.2d 327 (2d Cir.1964), *cert. granted*, 381 U.S. 933, 85 S.Ct. 1772, 14 L.Ed.2d 698 (1965), *cert. dismissed as improvidently granted*, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335, *reh. denied*, 384 U.S. 967, 86 S.Ct. 1583, 16 L.Ed.2d 680 (1966). In contrast, intrinsic fraud relates to issues which were litigated in the prior proceeding. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2861 (1973).[19]

■ The translated record of the Bolivian proceedings reveals that the plaintiff's answer to Aviles' appeal presented the whole life policy as one of the sources for her claims against ALICO. However, the record contains no indication that the plaintiff brought the Waiver to the attention of any Bolivian court. Aviles could not have asserted the Waiver as a defense in his exceptions since the complaint asserted claims based on the endowment policies and the personal accident policy. Further, since the Waiver was executed approximately eighteen months after the termination of his agency relationship with ALICO, Aviles would not have known about that document.

The plaintiff's omission of this material fact suggests that the Bolivian judgment is tainted with fraud. Since the Waiver was not an issue litigated before the Bolivian courts, the plaintiff's failure to refer to the document or explain the circumstances of its execution is fraud extrinsic to the Bolivian proceedings and of sufficient magnitude to preclude enforcement of the Bolivian judgment.[20]

### 5. Other *Hilton* Criteria

The court finds the record does not reveal any irregularity in the Bolivian proceedings (other than fraud), prejudice in the system of laws in which the Bolivian courts were sitting or prejudice in either the District Court or the Superior Court.

Further, there has been no showing that the Bolivian proceedings were conducted under a system of jurisprudence unlikely to secure an impartial administration of justice between the citizens of its own country and those of other countries. Bolivia is a nation with which the United States maintains friendly relations. One United States court has expressly recognized that Bolivia has a civilized system of jurisprudence. *Mathor v. Lloyd's Underwriters*, 174 So.2d 71, 72 (Fla.Dist.Ct.App.1965). There has been no indication Bolivian jurisprudence does not exhibit impartiality with regard to non-Bolivians.

Indeed, it appears the impartiality criteria only comes into play where a plaintiff seeks to enforce a money judgment from a country whose foreign policy manifests express hostility to the United States and whose jurisprudence has been molded to

---

**19.** The Third Circuit Court of Appeals abandoned this distinction between extrinsic and intrinsic fraud in *Publicker v. Shallcross,* 106 F.2d 949 (3d Cir.1939), *cert. denied,* 308 U.S. 624, 60 S.Ct. 379, 84 L.Ed. 521 (1940). Fraud, be it intrinsic or extrinsic, constitutes a grounds for examination of the previous judgment. *See Bandai America, Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70, 73 (3d Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986) ("... in this circuit no significance is attached to the distinction, sometimes articulated in the caselaw, between intrinsic and extrinsic fraud.").

Under Delaware law, the distinction has been eliminated in the context of enforcement of judgments from the courts of sister states. 10 *Del.C.* § 4782 provides that a judgment from another state shall be subject to the procedures, defenses and proceedings for reopening as a judgment of a Delaware Superior Court. Rule 60(b)(3) of the Delaware Superior Court Rules, like its federal counterpart, provides that a court may relieve a party from a final judgment for fraud, regardless of whether such fraud was heretofore denominated as extrinsic or intrinsic. It is unlikely that the Delaware Supreme Court would hold that the distinction between extrinsic and intrinsic fraud has been abolished for a judgment of a sister state court, but not for a judgment of a foreign nation.

**20.** Plaintiff through its expert postulates various theories upon which a Bolivian court might have rejected ALICO's fraud claim. This argument misses the point—plaintiff never brought the Waiver to the attention of the Bolivian court.

reflect that hostility. *See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 293 F.Supp. 892 (S.D.N.Y.1968), *modified* 433 F.2d 686 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971) (involving East German jurisprudence).

### III. Conclusion

The court will decline to recognize the Bolivian judgment because (a) service of process upon ALICO by service upon its former agent fails to comport with United States notions of constitutional due process and (b) the plaintiff's failure to allude to the Waiver taints the judgment by the Bolivian courts with fraud.

An order will be entered granting defendant's motion for summary judgment on the recognition claim and denying as moot defendant's summary judgment motion on plaintiff's bad faith claim.