**TRANSPORTES AEREOS PEGASO,
S.A. DE C.V., Plaintiff,**

v.

**BELL HELICOPTER TEXTRON
INC., Defendant.**

Civil Action No. 08–959.

United States District Court,
D. Delaware.

May 29, 2009.

Matthew Paul Ward, Womble Carlyle Sandridge Rice, Wilmington, DE, for Plaintiff.

Steven J. Fineman, Richards, Layton & Finger, PA, Wilmington, DE, for Defendant.

### MEMORANDUM

ROBERT F. KELLY, Senior District Judge.

This is an action brought pursuant to the Uniform Foreign Money–Judgment Recognition Act to enforce a Judgment entered by the Superior Court of Justice of the Federal District of Mexico.

Presently before the Court is the Motion for Summary Judgment filed by Defendant Bell Helicopter Textron Inc. ("Bell"), and the Motion to Strike Affidavits filed by Plaintiff Transportes Aereos Pegaso, S.A. DE C.V. ("Pegaso"). For the reasons set forth below, Pegaso's Motion to Strike is granted in part and denied in part. Bell's Motion for Summary Judgment is granted.

## I. BACKGROUND

Pegaso is a company incorporated as a Variable Equity Public Corporation in Mexico with a principal place of business in Mexico City, Mexico. Pegaso specializes in providing air transport in Mexico for both business and personal travelers. Bell is a Delaware corporation with its principal place of business in Fort Worth, Texas. Bell is a manufacturer and distributor of helicopters, and has multiple offices in the United States and abroad.

Bell asserts that in the fall of 1999, Petroleos Mexicanos [1] ("Pemex") requested proposals to provide air transport services for its offshore drilling operations in the Gulf of Mexico. (Def.'s Br. Supp. Mot. Summ. J. at 4.) Bell avers that Pemex's request required bidders to show they owned or could obtain three helicopters.

In response to Pemex's request, Bell claims that three bidders emerged: Heliservicio Campeche, Protexa/ASESA, and Pegaso. Bell states that each of the prospective bidders, including Pegaso, sought and received letters of intent ("LOIs") from Bell demonstrating an intention to sell the helicopters to the bidder should it be awarded the contract by Pemex. Bell further states that Pemex voided the original bids because "each of the bids was technically flawed."

Pegaso alleges that in February 2000, Pemex summoned a national public bid for the purpose of securing a contract for air transportation services via helicopter for certain regions within Mexico, and Pegaso was invited by Pemex to participate in the bid process. (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 4.) Bell claims that Pemex requested new proposals to be submitted by March 9, 2000. Bell states that the bidders requested, and Bell issued, new LOIs on March 6, 2000. Bell further states that the three LOIs were identical, listing the same serial numbers for the three helicopters to be sold, with two exceptions: 1) Protexa/ASESA's LOI had an earlier delivery date and a discounted price since Protexa/ASESA requested that the helicopters be delivered without paint; and 2) Pegaso's LOI contained the serial numbers for a fourth helicopter that it ordered, presumably for purposes other than servicing the Pemex contract.

1. In its Complaint, Pegaso refers to this company as "Pemex Exploracion y Produccion."

Bell contends that the LOIs provided for delivery dates that would satisfy Pemex's requirements. Specifically, Bell claims that it offered to deliver two helicopters (bearing serial numbers 36256 and 36257) to the winning bidder at the end of April 2000 and the third helicopter (bearing serial number 36259) to the winning bidder at the beginning of May. Bell further claims that if Pegaso won the contract, Bell offered to deliver a fourth helicopter to Pegaso (serial number 36260) at the beginning of June.

In connection with its desire to purchase the four helicopters, Pegaso avers that it negotiated with Bell through Bell's agent in Mexico, Art McAnarney ("McAnarney"). Pegaso asserts that McAnarney met with representatives of Pegaso in Mexico for the purpose of negotiating the sale, that Pegaso provided Bell with confidential information and that at all relevant times, McAnarney was aware of the purpose for which the helicopters were being purchased by Pegaso and the necessity of confidentiality concerning the information which Pegaso provided to Bell.

Pegaso alleges that Enrique Zepeda Morales ("Zepeda Morales"), President of Pegaso's Board of Directors, and McAnarney subsequently executed a "preparatory agreement" for the purchase of four helicopters. Pegaso further alleges that the terms of the agreement specified the number of helicopters to be purchased, the price at which the helicopters would be purchased, and the dates by which they would be delivered to Pegaso. Pursuant to the alleged agreement, Pegaso claims that Bell agreed to deliver three of the four helicopters in May 2000, and agreed to deliver the remaining helicopter in June 2000. Pegaso further claims that in rely-

ing on the alleged contract, it submitted a bid to Pemex for the performance of the services outlined in the request for proposal. Pegaso contends that the LOI and subsequent agreements between Pegaso and Bell were necessary components of Pegaso's bid and required by Pemex as a condition of Pegaso's participation in the bid process.

Bell, however, alleges that on March 7, 2000—one day after sending the LOIs, two days before the bids were due, and before any bidder submitted its proposal to Pemex—it discovered that the delivery dates stated in its March 6, 2000 LOIs were incorrect. (Def.'s Br. Supp. Mot. Summ. J. at 5.) Bell claims that it determined that it could not deliver the first two helicopters until the middle of May 2000 and the third helicopter until the end of May 2000. Moreover, Bell asserts that if Pegaso won the bid, Bell could not deliver Pegaso's fourth helicopter until the middle of June 2000. Bell contends that the new delivery dates were too late for Pemex's purposes, thus requiring the three bidders to obtain LOIs for helicopters from another source in order to bid on the contract.

Bell contends that McAnarney wrote, e-mailed and telephoned each of the three bidders to inform them of the change. Bell further contends McAnarney spoke with Zepeda Morales, Cristina del Canizo ("del Canizo") and Orlando Alaniz ("Alaniz") during a telephone call conducted on speakerphone. Bell claims that Zepeda Morales acknowledged Bell's change of dates during the call, that McAnarney then confirmed the information in an e-mail to Zepeda Morales and that McAnarney had similar conversations with Heliservicio and Protexa/ASESA.[2]

---

2. Bell alleges that upon receiving the news of the new delivery dates, Protexa/ASESA decided not to submit a bid, and Heliservicio made arrangements to procure the three helicopters from another source.

Pegaso, however, asserts that Bell failed to deliver the helicopters in a timely manner, and unbeknownst to Pegaso, unilaterally informed Pemex and the other participants in the bid process that it did not intend to deliver the helicopters to Pegaso within the timelines to which it had previously agreed. Bell, on the other hand, argues that, utilizing the incorrect March 6, 2000 LOI, Pegaso submitted its bid to Pemex despite its knowledge that Bell could not deliver in time to satisfy the bid requirements. In any event, Pemex ultimately disqualified Pegaso and awarded the contract to Heliservicio.

Pegaso asserts that by informing Pemex of its intent to act in breach of its contract with Pegaso, Bell disparaged Pegaso's reputation in Mexico's air transportation service industry. Pegaso further claims that the proposal submitted by Pegaso in the bid process was the most economical and advantageous bid, and but for Bell's breach of contract, Pegaso would have been awarded the contract with Pemex. In addition, Pegaso avers that Heliservicio had "significant commercial and economic ties to Bell," and that at no point during Bell's negotiations with Pegaso was Pegaso informed of Bell's "existing conflict of interest." (Pl.'s Compl. at 4–5.)

On March 5, 2001, Pegaso sued Bell in Mexico City Civil Court for breach of contract. Bell asserts that in its lawsuit, Pegaso claimed that the LOI constituted a contract with Bell for the sale of four helicopters and that Bell breached that contract by unilaterally changing the delivery dates for the helicopters.[3] Pegaso further alleged that Bell told Pemex that the dates of delivery of the helicopters had been changed without notifying Pegaso of the change or the communication with Pemex, causing "moral damage" to Pegaso. (Def.'s Br. Supp. Mot. Summ. J. at 6.) The lawsuit was assigned to Judge Justino Angel Montes de Oca of the Forty–Fourth Civil Court, United Mexican States, Superior Court of Justice for the Federal District, Mexico (the "Civil Court").

On or about April 17, 2001, Bell filed its answer to the lawsuit stating: 1) that it never contracted with Pegaso for the sale of four helicopters; 2) that it only issued a LOI to Pegaso and that a LOI carried no legal obligations under Mexican law; 3) that the sale of the helicopters was contingent on Pegaso winning the bid; 4) that Bell gave Pegaso proper notice of the change in delivery dates before Pegaso submitted its bid; and 5) that Bell informed PEMEX of the correct delivery dates in response to Pemex's inquiry, as it was permitted to do under Mexican law. Pegaso asserts that through its counsel, Bell appeared, conducted discovery and defended itself with respect to Pegaso's claims against it.[4]

On February 21, 2002, Judge Montes de Oca issued a ruling which found that the original March 6, 2000 LOI was a binding contract and that Bell breached this contract by changing the delivery dates. Judge Montes de Oca held Bell liable for compensatory damages in the amount of Pegaso's lost profits on the Pemex contract. In addition, Judge Montes de Oca awarded Pegaso as much as double the compensatory damages in "moral damages" for Bell's purportedly outrageous

---

3. Pegaso, however, asserts that "[t]he issue before the trial court was whether the preparatory agreement executed by Bell in favor of Pegaso was a binding and enforceable contract." (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 5.)

4. Bell denies that it participated in "discovery" in Mexico as that term is understood in American litigation.

conduct.[5] Bell claims that in reaching his decision, Judge Montes de Oca refused to consider significant components of Bell's evidence, including the testimony of two Bell witnesses, McAnarney and Alaniz. Bell further claims that Judge Montes de Oca grounded his judgment on evidence unfavorable to Bell that an appellate court (on an interim appeal) had directed him not to take into consideration.

Pegaso and Bell both appealed the trial court's decision. (Def.'s Br. Supp. Mot. Summ. J. at 7.) Bell asserts that on June 24, 2002, the Fourth Civil Court of Appeals ("Court of Appeals") issued an opinion, reversing in part and confirming in part the trial court's judgment. Bell contends that the Court of Appeals advanced a different basis for liability on Bell, that the LOI was not a binding agreement but was instead an agreement to agree, and reduced the amount of damages by the cost of the helicopters.[6]

Both parties then appealed to the Amparo Collegiate Court (the "Amparo Court").[7] Bell asserts that it challenged the new LOI claim and Pegaso challenged the deduction of the cost of the helicopters from the damages. Bell further asserts that the Amparo Court agreed with the Court of Appeals on the LOI claim but decided that the Court of Appeals erred by deducting the cost of the helicopters.[8] Bell states that the Amparo Court agreed that Pegaso's operating expenses would have to be deducted from the value of the Pemex contract to calculate the proper compensatory damages, but that the purchase amount for the helicopters would not be deducted.[9]

Bell asserts that by writ dated May 7, 2003, Pegaso initiated a proceeding for damages quantification in the original trial court, in front of Judge Montes de Oca.[10] Bell states that it answered the proceeding on or about May 15, 2003. Both parties requested and received permission to submit expert reports from accounting experts with respect to the amount of damages. The damages calculations in those expert reports, submitted on June 6, 2003, differed by more than ten million dollars. (Def.'s Br. Supp. Mot. Summ. J. at 8.) Bell asserts that as permitted by Mexican law, it posed written questions to Pegaso's ex-

---

5. Pegaso explains that "moral damages are damages awarded under Mexican law for damage to a party's reputation and honor."

6. Pegaso asserts that the court found that "the agreement by and between Bell and Pegaso was a binding and enforceable bilateral contract because it incorporated the material characteristics of a final purchase agreement.... The Fourth Civil Chamber of the Superior Court did, however, reverse the decision of the trial court with respect to the assessment of moral damages." (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 6.)

7. Pegaso refers to this court as the "Eleventh Civil Collegiate Court of the First Circuit." (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 6.)

8. Pegaso contends that the Amparo Court "denied Bell's request for constitutional pro-

tection," but granted Pegaso's request for "constitutional protection."

9. Pegaso states:

In accordance with [the Amparo Court's] decision, the Fourth Civil Chamber of the Superior Court confirmed its initial judgment in favor of Pegaso, as modified, and issued a judgment in Pegaso's favor dated March 4, 2003. The judgment did not include moral damages. Although each party had a right to file objections to the judgment, neither Bell nor Pegaso did so.

(Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 6–7.)

10. Pegaso asserts that it "filed an incident of execution of judgment on May 8, 2003, in the Forty–Fourth Civil Court of the Superior Court of Justice of the Federal District." (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 7.)

pert, but Pegaso's expert refused to answer the questions and Judge Montes de Oca ignored the refusal. Bell argues that the experts' calculations differed greatly from one another in part because Bell's expert properly accounted for Pegaso's costs of performance, including the depreciation of the helicopters over time, as was proper under Mexican law, while Pegaso's expert did not.

On June 12, 2003, after noting the conflict in the damages calculation, Judge Montes de Oca appointed Guillermo Aguilera Galindo ("Aguilera Galindo"), ostensibly to act as an independent expert.[11] Bell asserts that later evidence revealed that Judge Montes de Oca appointed Aguilera Galindo in violation of Mexican law.

Bell contends that immediately after his appointment, Aguilera Galindo solicited a bribe from Bell. Bell claims that one of Bell's attorneys, Jorge Enrique Hernandez Marin ("Hernandez Marin"), contacted Aguilera Galindo to meet with him and to present Bell's side of the case, as is common in Mexican civil practice. Bell asserts that at the meeting, Aguilera Galindo made it clear that he would sway his opinion for Bell in return for a monetary payment. Specifically, Bell claims that Aguilera Galindo told Hernandez Marin that if Bell wanted a favorable opinion from him,

it would have to pay him and that "everything has a cost."

Bell avers that Hernandez Marin reported the independent expert's demand for a bribe to his partner, Miguel Angel Hernandez–Romo Valencia, who, in turn, communicated it to Bell's deputy general counsel, Tim Harrington ("Harrington"). Bell further avers that Harrington stated that Bell would not accede to such a demand because Bell does not do business that way and because Bell viewed the solicitation as a violation of U.S. law. (Def.'s Br. Supp. Mot. Summ. J. at 9.) Bell claims that Hernandez Marin met with Aguilera Galindo again and told him that Bell would not pay him any amount of money. Bell contends that Aguilera Galindo told Hernandez Marin that he was relieved that Bell would not pay him because he had met with Judge Montes de Oca in the interim, and the judge had asked him for help with the case, as a personal favor, because he had a "personal interest" in the case.[12] Bell further claims that Aguilera Galindo stated that as a result of his conversation with Judge Montes de Oca, there was no way he could issue an opinion favorable to Bell. Bell argues that it was clear to Hernandez Marin that Aguilera Galindo would be

---

**11.** Pegaso states:

Article 349 of the Civil Procedures Code for the Federal District (hereinafter the "CPC") provides that when the expert reports submitted by the parties are substantially contradictory, the judge may appoint a third expert. In this instance, because the reports submitted by the parties were substantially contradictory, Judge Montes de Oca appointed a third expert. Although the CPC does not establish a particular procedure by which third-party experts must be selected or the order in which they must be selected, a separate administrative provision does provide that the third expert has to be selected from a published list in alphabetical order.

(Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 7.)

**12.** Pegaso points out that "Bell did not inform the trial court of the alleged bribe solicited by the expert. Nor did Bell raise this incident as an issue in its appeal of the incident of judgment entered by the trial court on July 16, 2003." (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 8.) Further, Pegaso argues that the allegation that Judge Montes de Oca might have had a "personal interest" in the case was "not raised in the course of either the underlying litigation or in the criminal complaint filed by Bell." (Id.)

writing an opinion favorable to Pegaso.[13]

On or about July 7, 2003, Aguilera Galindo rendered a report, which not only agreed with Pegaso's expert, but found an even greater amount of damages, in excess of sixteen million dollars. Judge Montes de Oca adopted that report and entered a judgment against Bell that Pegaso seeks to enforce in this action. In its Complaint, Pegaso avers that an "Interim Judgment" was entered in its favor on July 1, 2003. Bell avers that the judgment in the Forty–Fourth Civil Court proceeding was entered on July 16, 2003.

Bell asserts that Mexican law requires an independent expert to be appointed automatically, with no role for judicial discretion, and that independent experts are appointed sequentially from a list maintained alphabetically by paternal last name and published in the Judicial Bulletin. (Def.'s Br. Supp. Mot. Summ. J. at 10.) Bell claims that it has since learned that Judge Montes de Oca appointed an expert named Jesus Jimenez Granados ("Jimenez Granados") (paternal last name "Jimenez") in a case on June 9, 2003. Bell further claims that Jimenez Granados was expert number "30" on the list of accounting experts, and Mexican law required that accounting expert number "31" be appointed next. Rather, Bell alleges that three days later, Judge Montes de Oca appointed Aguilera Galindo (paternal last name "Aguilera") as an accounting expert in the Pegaso matter, and Aguilera Galindo was number "2" on the published list.[14] Bell further alleges Judge Montes de Oca did not record Aguilera Galindo's appointment in the official book maintained by the Civil Court. Bell also contends that in the next case in which Judge Montes de Oca appointed an accounting expert, on June 27, 2003, he appointed Sergio Mario A. Lira Espinoza (paternal last name "Lira"), expert number "31" on the list, thus returning to the legally required order.[15]

In March 2003, Bell filed a criminal accusation of facts against Judge Montes de Oca. (Def.'s Br. Supp. Mot. Summ. J. at 11.) Bell argued that Judge Montes de Oca committed three crimes against the administration of justice. First, Bell as-

---

**13.** Bell claims that "[y]ears later, Mr. Hernandez–Romo and Mr. Hernandez Marin met with Mr. Aguilera Galindo again. They asked Mr. Aguilera Galindo to confirm the details of his solicitation of Bell and his conversation with Judge Montes de Oca and he did so. Mr. Aguilera Galindo understandably refused to sign a declaration setting forth those facts." (Def.'s Br. Supp. Mot. Summ. J. at 9.)

**14.** Pegaso states:

Although Bell was entitled to file an objection on the basis of the alleged violation of the administrative provision, Bell elected to not file an objection or otherwise bring the alleged error to the attention of the trial court. Instead, according to the affidavits filed in support of Bell's motion for summary judgment, Bell elected over three years later to file a separate and independent administrative disciplinary claim with respect to this issue with the Commission of Judicial Discipline.

(Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 7–8.)

**15.** When Bell learned of Judge Montes de Oca's allegedly unlawful act, it filed an administrative claim before the Commission of Judicial Discipline in Mexico City (the "Commission"). Bell claims that the Commission requested that the Forty–Fourth Civil Court provide the pages from its internal book reflecting the dates of appointment of independent experts. Bell states that the Commission found both that the book did not reflect an appointment in the Pegaso matter and that Judge Montes de Oca had appointed Aguilera Galindo out of order. However, the Commission determined on August 15, 2006 that the statute of limitations had run on Bell's claim, despite Bell's assertion that it "did not learn of the information until the Commission obtained the internal appointment book in 2006." (Def.'s Br. Supp. Mot. Summ. J. at 11.)

serted that the judge considered Pegaso's evidence but refused to consider important evidence submitted by Bell, in violation of Article 291, Part III, of the Criminal Code of the Federal District. Second, Bell claimed that Judge Montes de Oca grounded his judgment on evidence that an appellate court directed him not to take into consideration, in violation of Article 290, Part II, of the Criminal Code of the Federal District, which makes it a crime if a judge "[d]oes not comply with an instruction legally communicated by its competent superior authority." Finally, Bell argued that the judge rendered a judgment that relied on evidence that he had ruled inadmissible earlier in the proceeding, in violation of Article 290, Part I, of the Criminal Code of the Federal District.

Despite years of inquiry and litigation, Mexican authorities have not yet concluded their investigation into the allegations prompted by Bell's criminal filing against Judge Montes de Oca in 2003. Bell states that several public prosecutors have attempted to delay or dismiss the accusation but, each time, a higher authority has directed the prosecutor either to continue with the investigation or to render a more immediate decision.[16] Bell further states that a federal court also has ruled in Bell's favor, ordering the public prosecutor to end its delay and to render a decision. (Def.'s Br. Supp. Mot. Summ. J. at 12.) Moreover, Bell claims that it has submitted legal opinions of three noted experts in Mexican law to explain why sufficient grounds exist to prove the claims against the judge. Finally, Bell asserts that it has filed three requests with the public prosecutor's office to suspend the enforcement of the judgment against Bell, and the third request for a suspension is still pending in Mexico.[17]

Pegaso states that Bell's appeal of the "incident of judgment" was assigned to the Superior Court of Justice for the Federal District in the Eighth Civil Chamber (the "Superior Court"). Pegaso contends that the Superior Court amended the incident of judgment by clarifying the terms under which to prepare the calculation of Pegaso's damages. Bell and Pegaso each responded by filing additional writs of amparo. The writs were turned over to the Second District Civil Court.

On March 22, 2004, the Second District Civil Court issued a judgment in which it found that the Superior Court had not fully considered each of the arguments raised by Bell and ordered it to separately consider each of Bell's arguments. (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 8.) In accordance with the decision of the Second District Civil Court, the Superior Court reconsidered the matter and issued a new judgment on January 19, 2005. (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 8–9.)

In a decision published on March 22, 2006 (docket number 2272/2003–3), the Superior Court of Justice for the Federal District in the Eighth Civil Chamber modified the judgment of the Civil Court and ordered Bell to pay Pegaso $16,599,924.70

---

**16.** Bell states that the higher authorities who have ordered the prosecutor's office to proceed with the investigation include the two Assistant Attorneys General charged with hearing internal appeals in the prosecutor's office.

**17.** Bell points out that "[i]n the spring of 2006, the Superior Tribunal of Justice of Mexico City demoted Judge Monies de Oca, for conduct unrelated to this case, from his position as a judge of the 44th Civil Court to a judge handling only leasing matters. Judge Montes de Oca was replaced in the 44th Civil Court by Judge Angel Humberto Montiel Trujano." (Def.'s Br. Supp. Mot. Summ. J. at 12.)

and 6,293,198.22 pesos.[18] (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 9.)

Pegaso claims that, based on a "finding issued by a proceeding dated May 2, 2006," Bell failed to voluntarily pay Pegaso in accordance with the Mexican Superior Court's judgment. (Pl.'s Compl. at 5.) On or about May 9, 2006, Bell filed a "Presentation of Revokement Recourse" in which Bell disputed the authority of the Mexican Superior Court to allow the attachment of its property because Bell is domiciled in the United States of America. (*Id.* at 5–6.) By Order dated May 26, 2006, Bell's Presentation of Revokement Recourse was declared inappropriate and the proceeding dated May 2, 2006 was confirmed. (*Id.* at 6.) To date, Bell has failed to satisfy the judgment rendered by the Mexican Superior Court and has removed its assets from Mexico to avoid any collection efforts by Pegaso within Mexico.

On December 19, 2008, Pegaso filed the instant lawsuit, requesting that this Court enforce the judgment of the Mexican Superior Court pursuant to the Uniform Foreign Money–Judgment Recognition Act. Pegaso argues that the "final judgment" it obtained is "res judicata and not subject to further appeal," and that "[n]o known related actions, criminal or otherwise, are currently proceeding." (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 10.) On February 2, 2009, Bell filed an Answer to Pegaso's Complaint and a Motion for Summary Judgment. On March 9, 2009 Pegaso filed a Motion for Judgment on the Pleadings, a Response to Bell's Motion for Summary Judgment and a Motion to Strike several of Bell's exhibits. On March 31, 2009, Bell filed a Consolidated Response to Pegaso's Motion for Judg-

ment on the Pleadings and Motion to Strike Affidavits. On April 7, 2009, Pegaso filed a Reply to Bell's Response to Pegaso's Motion for Judgment on the Pleadings and Motion to Strike Affidavits.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.'" *Hines v. Consol. Rail Corp.,* 926 F.2d 262, 267 (3d Cir.1991). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. *Big Apple BMW, Inc. v. BMW of N. Am. Inc.,* 974 F.2d 1358, 1362 (3d Cir.1992). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs,* 995 F.Supp. 554, 561 n. 14 (E.D.Pa.1998), *aff'd,* 172 F.3d 40 (3d Cir.1998).

Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates that there is a genuine issue of fact requir-

---

**18.** Pegaso states that "[i]n a resolution issued subsequent to the Final Judgment, the [Second District Civil Court] determined that the Superior Court ... correctly analyzed the re- port submitted by the expert and correctly considered all arguments submitted by Bell in objection thereto." (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. at 9.)

ing a trial. *See Big Apple BMW*, 974 F.2d at 1362–63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

## III. DISCUSSION

Pegaso seeks to strike several of Bell's Declarations submitted in support of its Motion for Summary Judgment. Before deciding the Motion for Summary Judgment, we will first consider the evidentiary challenges advanced in Pegaso's Motion to Strike.

### A. EVIDENTIARY RULINGS

Federal Rule of Civil Procedure 56(e) allows the use of affidavits in connection with a summary judgment motion when the affidavit is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant is competent to testify on the matters stated." All affidavits must be submitted in good faith. Fed. R. Civ. P. 56(g). The requirements are mandatory. Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10B *Federal Practice and Procedure* § 2738 (1998). Thus, all declarations submitted in support of Bell's argument that the Mexican judgment was obtained through fraud must satisfy these requirements before this Court can consider them in conjunction with Bell's Motion for Summary Judgment. In its Motion to Strike, Pegaso advances numerous arguments as to why this Court should not consider certain information contained in Bell's Declarations.

### 1. Declaration of Jorge Enrique Hernandez Marin

■ Pegaso first moves to strike several statements from the Declaration of Jorge Enrique Hernandez Marin on the basis of hearsay. Pursuant to the Federal Rules of Evidence, hearsay statements are statements "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Courts should not consider inadmissible hearsay statements in conjunction with motions for summary judgment. *Henry v. Nanticoke Surgical Assoc., P.A.*, 931 A.2d 460, 462 (Del.Super.Ct.2007). Hearsay statements are not admissible unless they qualify as one of the exceptions to the hearsay rule. *Id.* at 463.

■ Pegaso first contests the admissibility of the following statement contained in the Hernandez Marin Declaration on the basis that the statement is inadmissible hearsay:

> During the course of our meeting, it became clear that Mr. Aguilera Galindo would sway his opinion in Bell's favor in return for monetary payment. Mr. Aguilera Galindo told me that if Bell wanted a favorable opinion in the case, Bell would have to pay him and that everything has a cost.

(Hernandez Marin Decl. ¶ 4.) Bell counters that the statement is not hearsay, but instead qualifies as a "verbal act." (Bell Consol. Reply 10.) Under the Federal Rules, a statement constituting a "verbal act" is not hearsay. *See* Fed. R. Evid. 801(c). A "verbal act" is a statement that has legal significance or brings about a legal consequence, simply by its existence. *United States v. Saada*, 212 F.3d 210, 218 n. 8 (3d Cir.2000). Verbal acts do not

constitute hearsay because they are not being offered for the truth of the matter, but rather, are relevant for the mere fact that they were spoken. *Id.* The Advisory Committee Notes to Rule 801(c) state:

[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. . . . The effect is to preclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.

Fed. R. Evid. 801(c) advisory committee's note.

■ After considering the position of both parties, this Court finds that the statement constitutes a "verbal act" and is not hearsay. The statement relates to information that Aguilera Galindo solicited a bribe from Hernandez Marin in exchange for Aguilera Galindo issuing a report in Bell's favor. As Bell points out, the solicitation of a bribe is illegal. (Bell Consol. Reply 10.) Thus, evidence of the solicitation of a bribe is a legally operative fact, important for the mere fact that the words were said and not for the truth of the matter. Furthermore, courts have specifically held that words of bribery constitute verbal acts and fall outside the hearsay rule. *See, e.g., United States v. Gonsiewski,* 277 F.Supp. 300, 303 (E.D.Pa.1967); *United States v. Moss,* 9 F.3d 543, 550 (6th Cir.1993). Therefore, we conclude that this statement is admissible and will deny Pegaso's Motion to Strike with respect to this statement.

■ Next, Pegaso asserts that the following statement of Hernandez Marin should also be excluded on the basis of hearsay:

Mr. Aguilera Galindo told me that he felt relieved at what I had said because the judge had a "personal interest" in the case that was in conflict with Bell's position. Mr. Aguilera Galindo said that between our two meetings he had visited the courthouse to talk to Judge Montes de Oca and to review the file, as was customary. Mr. Aguilera Galindo told me that the judge had asked him for help, as a personal favor, because the judge had a "personal interest" in the case. Mr. Aguilera Galindo told me that as a result of this conversation with the judge there was no way he could issue an opinion favorable to Bell, as he had offered in our last meeting.

(Hernandez Marin Decl. ¶ 6). Despite Pegaso's argument, we find that the statement is admissible for the limited purpose of demonstrating Aguilera Galindo's motive or intent to find for Pegaso. Pursuant to Rule 803(3), statements offered to show the state of mind of the declarant fall under an exception to the hearsay rule. Rule 803(3) states:

The following are not excluded by the hearsay rule, even though the declarant is unavailable as a witness:

. . .

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3). In speaking of the state of mind exception, the Third Circuit has stated, "there are times when a state of mind, if relevant, may be proved by contemporaneous declarations of feeling or intent." *United States v. Hernandez,* 176

F.3d 719, 726–27 (3d Cir.1999) (quoting *Shepard v. United States,* 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196 (1933)). However, the scope of the exception must be limited. *Id.* at 727. "Statements that are considered under the state of mind exception, cannot be offered to prove the truth of the underlying facts asserted." *Id.* (quoting *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1274 (3d Cir.1995)).

Here, the statement tends to show Aguilera Galindo's intent to issue an opinion in favor of Pegaso. In light of the fact that the rule makes clear that a statement is not admissible under the exception to prove the truth of the fact remembered, we agree with Pegaso that, if Bell were offering the statement to prove that Judge Montes de Oca did have a "personal interest" in the case, or that he asked Aguilera Galindo to find in Pegaso's favor, the statement would be inadmissible hearsay. *See* Fed. R. Evid. 803(3); *Hernandez,* 176 F.3d at 727. However, the statements bears on Aguilera Galindo's state of mind regardless of its underlying truth. Whether the judge did actually have an interest is immaterial to Aguilera Galindo's belief that he did. *See United States v. DiMaria,* 727 F.2d 265, 271 (2d Cir.1984) (admitting statement offered not for its truth but as evidence of what the defendant was thinking at the time the statement was made). The importance of the statement lies in the fact that it shows Aguilera Galindo's intent or motive to find for Pegaso and against Bell. *Id.*; *United States v. Donley,* 878 F.2d 735, 737 (3d Cir.1989) (finding evidence admitted under Rule 803(3) "may also be used to prove or explain acts or conduct of the declarant"). Furthermore, evidence that the court-appointed expert had a motive or intention to find in favor of the opposing party is relevant to Bell's assertion that the judgment in the Mexican action was obtained by fraud. *Donley,*

878 F.2d at 738 citing *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892) (holding statements admitted to show declarant's intent or plan may be used to show that the declarant acted in accord with that plan.) Thus, this statement is admissible as evidence of Aguilera Galindo's state of mind. Fed. R. Evid. 803(3).

■ With respect to Pegaso's remaining contentions concerning the Hernandez Marin Declaration, we agree with Pegaso that the contested statements are inadmissible. Pegaso moves to strike the following two statements from the Declaration of Hernandez Marin:

> Later that day, Mr. Hernandez–Romo told me that he had a conversation with Mr. Harrington who instructed our firm that Bell would not accede to such a demand because it did not do business that way and that he viewed such a request as a violation of U.S. law. (Hernandez Marin Decl. ¶ 5.)

> Mr. Aguilera Galindo confirmed that what he told me in June, 2003 was true, but said that he would not be willing to put those comments in an affidavit for use in Mexico or the United States. (*Id.* ¶ 7.)

Here, Hernandez Marin is testifying to out-of-court statements made by Hernandez–Romo Valencia and Harrington. The statements are based upon information that Hernandez–Romo Valencia and Harrington told Hernandez Marin; thus, these out-of-court statements must fit into one of the hearsay exceptions in order to be admissible. *Henry,* 931 A.2d at 463. Bell does not directly address the admissibility of these particular statements in its Reply to Pegaso's Motion to Strike, and this Court finds no exception to the hearsay rule which would render these statements admissible. As such, we grant Pegaso's

Motion to Strike with respect to these statements.

### 2. Declaration of Miguel Angel Hernandez–Romo Valencia

Pegaso challenges the admissibility of several statements contained in the Declaration of Miguel Angel Hernandez–Romo Valencia ("Valencia"). Specifically, Pegaso argues that the following statements should be stricken on the basis of hearsay:

> On June 16, 2003, Jorge Enrique Hernandez Marin, another partner at the Hernandez Romo law firm representing Bell, told me he had met that morning with Guillermo Aguilera Galindo, whom Judge Angel Montes de Oca had appointed as an independent expert to provide a valuation of damages. Mr. Hernandez Marin reported that Mr. Aguilera Galindo offered to write an opinion favorable to Bell in exchange for a payment. (Valencia Decl. ¶ 2.)
>
> Mr. Harrington told me Bell would not accede to such a demand because Bell did not do business that way and viewed the expert's request as a violation of U.S. law. (Id. ¶ 3.)
>
> Mr. Aguilera Galindo confirmed for us that in June of 2003 he told Mr. Hernandez Marin that he would form an opinion to favor Bell if Bell paid him. He also repeated that he had a conversation with Judge Montes de Oca where the judge had asked Mr. Aguilera Galindo for help with the case, as a personal favor, because Judge Montes de Oca had a "personal interest" in the case. (Id. ¶ 4.)
>
> Mr. Aguilera Galindo said that he would not be willing to sign an affidavit for use in Mexico or the United States. (Id. ¶ 5.)

We agree with Pegaso's arguments that these statements are hearsay and should be stricken. All of the statements rest upon and reiterate information that Valencia learned from Hernandez Marin, Harrington, or Aguilera Galindo. As each of the contested statements contains Mr. Valencia's account of what someone else told him, they are inadmissible to the extent that they are offered for the truth of the matter asserted. *Henry*, 931 A.2d at 463. Thus, the Motion to Strike is granted with respect to those statements.

### 3. Declaration of Tim J. Harrington

■ Pegaso moves to strike several statements from the Declaration of Tim J. Harrington. Pegaso's first argument relates to the following two statements, which it asserts should be stricken on the basis of hearsay:

> Bell representative Art McAnarney wrote, e-mailed, and telephoned each of the three bidders to inform them of the change. Mr. McAnarney spoke with Enrique Zepeda Morales, President of Pegaso's Board of Directors, by speakerphone with Cristina del Canizo and Orlando Alaniz present during the telephone call. Mr. Zepeda acknowledged Bell's change of dates during the call. Mr. McAnarney then confirmed the information in an email to Mr. Zepeda. McAnarney had similar conversations with Heliservicio and Protexa/ASESA. (Harrington Decl. ¶ 8.)
>
> In June of 2003, I learned from Miguel Angel Hernandez–Romo Valencia, one of Bell's outside counsel handling the matter in Mexico, that Judge Montes de Oca had appointed an independent expert on the issue of damages and that the expert had solicited a bribe to sway his opinion in favor of Bell. (Id. ¶ 16.)

We will grant Pegaso's Motion to Strike with respect to these statements. Bell has not addressed the admissibility of these particular statements in its Response to Pegaso's Motion to Strike. Nonetheless, we agree that the statements are hearsay if they are offered for the truth of the

matter asserted. Furthermore, the issue before this Court is whether the proceedings in the Mexican courts were conducted in such a way that the ultimate judgment in that case was obtained through fraudulent means. The first statement relates to the reasonableness of Pegaso's actions in its dealings with Bell, a question not before this Court. The information contained in the second statement, apart from being hearsay, has already been set forth in the Declaration of Hernandez–Romo Valencia, himself, as well as in several other declarations submitted by Bell. Therefore, these statements will be stricken.

Pegaso's final argument with respect to the Harrington Declaration is that Harrington makes self-serving legal conclusions in Paragraph 17 of his Declaration, wherein he states: "Bell never had a binding contract with Pegaso. The letter of intent between Bell and Pegaso did not contain any of the details necessary for the actual purchase of the helicopters." (Harrington Decl. ¶ 17.)

An affiant states a legal conclusion by applying the law to the facts. *Highway Materials, Inc. v. Whitemarsh Tp., Montgomery County, Pa.,* No. 02–3212, 2004 WL 2220974, at *19 (E.D.Pa. Oct. 4, 2004) (Kelly, Sr., J). The Federal Rules do not permit experts to testify as to legal conclusions. *Id.* at *20 (referencing *VIM, Inc. v. Somerset Hotel Assoc.,* 19 F.Supp.2d 422, 427 n. 4 (W.D.Pa.1998), *aff'd,* 187 F.3d 627 (3d Cir.1999)); *see also Watkins v. New Castle County,* 374 F.Supp.2d 379, 392–93 (D.Del.2005) (citing *Salas by Salas v. Wang,* 846 F.2d 897, 905 n. 5 (3d Cir.1988)). "While testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *VIM, Inc.,* 19 F.Supp.2d at 427 n. 4. In *VIM, Inc.,* the district court judge determined that because expert testimony as to legal conclusions did not assist the trier of fact in determining a fact in issue, it could not be considered on a motion for summary judgment. *Id.*

Similarly, in *Highway Materials v. Whitemarsh Tp.,* where the plaintiff's expert testified that the defendant's conduct "shocked the conscience," the testimony amounted to "a legal conclusion clearly within the purview of this Court's decision making power rather than a party's expert." 2004 WL 2220974, at *20. As the Court had already decided that the defendant's actions did not "shock the conscience," the expert's testimony did not raise a genuine issue of material fact on the matter for purposes of summary judgment. *Id.*

As in *Highway Materials v. Whitemarsh Tp.,* Harrington's testimony here relates to the question of the existence or non-existence of a contract between Bell and Pegaso, a question that has already been decided by the Court in the underlying Mexican litigation. Whatever the propriety of that Court's decision, it was for the Court and not Harrington to decide. Furthermore, the statement is of little relevance in the matter before this Court, as we are asked to determine whether the judgment should be enforced in the District of Delaware and not whether a contract existed between the parties. As such, we find that Harrington's testimony on this point is a legal conclusion that we will not consider on this Motion for Summary Judgment. *See id.*

### 4. Declaration of Julio Isidro Santos Coy Aguilar

Pegaso moves to strike the Declaration of Julio Isidro Santos Coy Aguilar ("Coy Aguilar") on the basis that it is not based on personal knowledge and contains

opinions of law. Bell appears to offer Coy Aguilar as an expert in foreign law, as the majority of his Declaration pertains to the operation of Mexican law. The Federal Rules address the determination of foreign law in Rule 44.1, which provides that federal courts, "in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. This is a broad standard, leaving the judge with room to consider various different types of evidence. Fed. R. Civ. P. 44.1 advisory committee's note. One common source that judges rely upon in determining foreign law are the affidavits of lawyers who practice law in the country at issue, or who are from the country at issue and are familiar with its laws. *See, e.g., Akande v. Transamerica Airlines, Inc.,* No. 1039–VCP, 2007 WL 1555734, at *7 (Del.Ch. May 25, 2007).

■ Here, Mr. Coy Aguilar's personal knowledge of Mexican law is established by his own testimony that his statements are based upon his seventeen years of experience as a practicing attorney in Mexico. (Coy Aguilar Decl. ¶ 1.); Fed. R. Evid. 602 (evidence to prove personal knowledge may, but need not, consist of the witness' own testimony). While Pegaso argues that aside from Coy Aguilar's position as an attorney in Mexico there is nothing to suggest that he has personal knowledge of the information contained in his Declaration, Pegaso fails to identify which information, in particular, that it is contesting. (Pl.'s Mot. to Strike at 5.)

With respect to this case in particular, Coy Aguilar stated in his Declaration that he has "reviewed copies of the pleadings, court orders, judgments, and other documents that comprise the file of the commercial lawsuit initiated by Transportes Aereos Pegaso, S.A. de C.V. ... against Bell," as well as "copies of certain documents related to a criminal complaint (querella) that has been filed against Judge Justino Angel Montes de Oca." (*Id.* at ¶ 3.) This is sufficient to establish Coy Aguilar's personal knowledge of the facts that he attests to concerning the case at hand. *See Tex. E. Transmission PCB Contamination Ins. Coverage Litig.,* 870 F.Supp. 1293, 1303–04 (E.D.Pa.1992) (holding "all perception is inferential to some degree," and given employee had reviewed company documents and vouched for their truthfulness, he had sufficient personal knowledge of the facts.)

In light of Coy Aguilar's expertise in the area of Mexican law, his familiarity with the case at hand, the wide latitude afforded this Court by Rule 44.1, and the fact that courts have long relied upon affidavits submitted by practicing attorneys in foreign jurisdictions in determining foreign law, this Court finds that the Declaration of Coy Aguilar is admissible to explain the operation of Mexican law and how this particular case deviated from standard practice under Mexican law.[19]

## B. UNIFORM FOREIGN MONEY JUDGMENTS AND RECOGNITIONS ACT

■ Under the Uniform Foreign Money Judgments and Recognition Act

---

**19.** Lastly, Pegaso has advanced an argument that this Court should strike the Declaration of Pablo Hernandez–Romo Valencia as irrelevant. Pegaso argues that the Declaration is irrelevant because it relates to a criminal action in Mexico, in which Pegaso is not a party. In response, Bell asserts only that the Declaration is relevant to its argument that this Court should stay these proceedings in the event that it is not inclined to grant Bell's Motion for Summary Judgment. However, because the case will not be stayed, we need not discuss at length the relevance of Pablo Hernandez–Romo Valencia's Declaration with respect to Bell's request for a stay.

("UFMJRA"), Delaware courts are required to recognize and afford full faith and credit to "any foreign judgment that is final and conclusive and enforceable where rendered...." 10 Del. C. § 4801 et. seq. The UFMJRA is a codification of common laws of comity. *See Akande*, 2007 WL 1555734, at *4. The Third Circuit has described the doctrine of comity as follows:

> Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience and expediency. Although more than mere courtesy and accommodation, comity does not achieve force of imperative or obligation. Rather it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.

*Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971); *de la Mata v. Am. Life Ins. Co.*, 771 F.Supp. 1375, 1380 (D.Del.1991).[20]

> The UFMJRA provides for the recognition of foreign judgments, meaning judgments granting or denying recovery of a sum of money rendered in a jurisdiction outside the United States and its territories. The Act has been adopted in over 30 states. As adopted in Delaware, the Act applies to any foreign judgment that is final and conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal.

*Akande*, 2007 WL 1555734, at *4.[21]

The UFMJRA provides that a foreign judgment is not conclusive if:

> (1) The judgment was rendered under a system which does not provide for impartial tribunals or procedures compatible with the requirements of due process of law;
>
> (2) The foreign court did not have personal jurisdiction over the defendant; or
>
> (3) the foreign court did not have jurisdiction over the subject matter.

10 Del. C. § 4804(a).

The Act further states that a foreign judgment need not be recognized if:

> (1) The defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable the defendant to defend;
>
> (2) The judgment was obtained by fraud;
>
> (3) The cause of action on which the judgment is based is repugnant to the public policy of this state;
>
> (4) The judgment conflicts with another final conclusive judgment;
>
> (5) The proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court; or

---

**20.** United States courts will recognize foreign judgments under the doctrine of comity, as contrasted with any constitutional requirement such as affording full faith and credit to the judgments of the courts of sister states. *See Aetna Life Ins. Co. v. Tremblay*, 223 U.S. 185, 190, 32 S.Ct. 309, 56 L.Ed. 398 (1912).

**21.** "The purpose of the UFMJRA is to make it more likely that judgments rendered in a state that adopted the Act will be recognized abroad, since in a large number of civil-law countries, the granting of conclusive effect to money judgments from foreign courts is made dependent on reciprocity." *Akande*, 2007 WL 1555734, at *5.

(6) In the case of jurisdiction based only on personal service, the foreign court was not a seriously inconvenient forum.

10 Del. C. § 4804(b).

■ As stated above, Bell asserts that Delaware cannot recognize the Mexican judgment in this matter under the UFMJRA because it was obtained by fraud. Pegaso argues that the burden of proof is on Bell to produce "clear and convincing" evidence of fraud. We disagree.

In support of its position, Pegaso cites to Federal Rule 9(b) which states:

In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). However, as is obvious from a reading of this Rule, it clearly does not require that Bell produce "clear and convincing evidence" in alleging fraud. In further support that Bell has the burden of showing "clear and convincing" evidence of fraud under Delaware's

UFMJRA, Pegaso cites only one case, a District of Columbia district court decision. *Nesse v. Pittman*, 202 F.R.D. 344 (D.D.C.2001). Pegaso quotes a portion of this case to support its position:

To construct such a large and nefarious conspiracy on a single alleged misstatement is not to prove prima facie the existence of that conspiracy. It is merely to charge that fraud occurred, and such a charge is insufficient. Blair's "proof" of a conspiracy to cover up SP's lies is not proof at all; it is an ontological leap of faith.

*Id.* at 352.[22]

However, this case does not support Pegaso's position. It is apparent that Pegaso did not cite any Delaware cases because there are no Delaware decisions which address the UFMJRA and apply a "clear and convincing evidence" standard in actions alleging fraud involving a foreign judgment. In fact, we have found only two Delaware decisions that interpret this Act at all, and only one that addresses the issue of fraud.[23] One of these decisions,

22. Pegaso acknowledges in its response to the Motion for Summary Judgment that Bell raises the "specter of fraud" in its allegations, but argues hat this is not enough under a clear and convincing evidence standard. (Pl.'s Resp. Mot. Summ. J. at 13.) Pegaso asserts that the alleged fraud "appears to boil down to the following allegations: (1)the trial judge, Judge Montes de Oca, allegedly told an expert who told a Bell representative that he had a 'personal interest' in the case; (2) an attorney in Mexico opines that Judge Montes de Oca allegedly violated an administrative provision by appointing an expert out of alphabetical order; and (3) the expert appointed by Judge Montes de Oca attempted to bribe Bell, albeit unsuccessfully. (Pl.'s Resp. Def.'s Mot. Summ. J. at 13.)

23. Even before the enactment of the UFMJRA in 1997, the Delaware courts never adopted a "clear and convincing evidence" standard for recognizing foreign judgments infected by fraud. In fact, like the lack of cases from the

Delaware courts interpreting the UFMJRA, there are also very few cases addressing foreign judgments prior to the enactment of this Act. In *de la Mata v. American Life Ins. Co.*, *supra* at 1381, the court stated that "Delaware's jurisprudential landscape does not contain many precedents with respect to the recognition of foreign judgments." The court determined that it would look to the landmark United States Supreme Court case, *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), for instances where a foreign judgment may be recognized in Delaware. *Hilton* set forth the requisite criteria for a finding of comity to permit the recognition and enforcement of a foreign judgment as follows: (1) opportunity for a full and fair trial; (2) trial before a court of competent jurisdiction; (3) proceedings following due citation or voluntary appearance of adversary parties; (4) trial conducted upon regular proceedings; (5) trial under a system of jurisprudence likely to secure an impartial adminis-

*Akande,* 2007 WL 1555734, at *6, acknowledged such, and states "this Court knows of only one Delaware case interpreting the UFMJRA, *ABD Alwakhad v. Amin,*[24] a case that dealt, in part, with issues of notice." [25]

In *ABD Alwakhad,* the plaintiff sought to have the Delaware court recognize and enforce an Israeli default judgment issued against a defendant on a $130,000 promissory note executed by her co-defendant husband. 2005 WL 2266662, at *1. Only the husband's signature appeared on the note, although the note bore an identification number which, according to the husband, identified the husband and wife as a married couple. *Id.* "The stated purpose of the note was to facilitate a move to the United States and according to the husband, the wife and he used the proceeds from the note to finance their relocation to the United States." *Id.* The wife, however, testified that she was unaware that the husband executed the note, that she would not have agreed to it had the husband discussed it with her, as they had saved significant money for the move to the United States which was used in the relocation. *Id.*

In addressing the issue of fraud under § 4801, the court determined that "based on the evidence presented, the Court has concerns that the judgment may have been obtained by fraud." *Id.* at *3. In making its decision, the court appeared to rely solely on the testimony of the parties, and stated:

> The Wife testified convincingly that she knew noting about the Note and would have not agreed to it because the couple had sufficient savings to fund their relocation to the United States. The Court finds wholly unbelievable the Husband's claim that he carried $130,000 in cash in a bag to the United States undetected by and unbeknownst to airport security, customs, or any other person, including the Wife.

*Id.* The court concluded that because "[it] is not satisfied that the foreign judgment was not obtained by fraud, the Court finds the foreign judgment non-conclusive, and thus, unenforceable, under the Act." *Id.*

▆ Thus, it appears that under the scant Delaware case law interpreting the UFMJRA, this Court, after looking at the evidence produced concerning the foreign judgment, is to determine whether it is "satisfied" that the Mexican judgment in this matter "was not obtained by fraud." *Id.*

We are not. Bell has presented evidence that court-appointed experts in the Mexican court system are strictly appointed in alphabetical order by the paternal last name listed on the court's official doc-

---

tration of justice between the citizens of its own country and those of other countries; and (6) no evidence to demonstrate a fraud in the procuring of the judgment, prejudice in the system of laws in which the court was sitting, prejudice in the court, or any other special reason why comity of the United States should not allow full effect. *Id.* at 202–03, 16 S.Ct. 139; *See also Kohn v. Am. Metal Climax, Inc.,* 458 F.2d 255, 302 (3d Cir.1972).

Under these guidelines, the *de la Mata* court refused to recognize a Bolivian judgment because the plaintiff, seeking to recover under a life insurance policy, had failed to bring to the Bolivian court's attention that she had signed a waiver of those claims. *de la Mata,* 771 F.Supp. at 1388–89. The court held that a "foreign judgment is not entitled to recognition if the judgment was obtained by fraud." *Id.* at 1388.

24. No. L–21–489, 2005 WL 2266662, at *1 (Del.Super.Ct. Sept. 14, 2005).

25. The court in *Akande* recognized a Nigerian judgment but noted that the case was "distinguishable from *Awad Amin* in several respects. Defendants in this case have made no specific allegations of fraud." 2007 WL 1555734, at *7.

uments. (Coy Aguilar Decl. ¶ 5; Hernandez Marin Decl. ¶ 8.) Notwithstanding this procedure, Judge Montes de Oca appointed the expert in this case, Aguilera Galindo, out of order, in contravention of Mexican law. (*Id.* at ¶ 6; *Id.*) The evidence also shows that Judge Montes de Oca failed to record his appointment of Aguilera Galindo in the court's internal records, and that the judge returned to appointing experts alphabetically, in the legally required fashion, following Pegaso's case against Bell. (Hernandez Marin Decl. ¶ 9.) In addition, Bell has presented evidence that Aguilera Galindo, appointed out of order against Mexican law, solicited a bribe from Hernandez Marin, stating that if Bell wanted a favorable opinion in the case, Bell would have to pay, as "everything has a cost." (*Id.* at ¶ 4.) Furthermore, Bell presented evidence that Aguilera Galindo later expressed relief that he would not have to go through with his offer because he could not find for Bell due to the judge's personal interest in the matter. (*Id.* at ¶ 5.) This evidence, coupled with the fact that a criminal investigation of Judge Montes de Oca is currently underway in Mexico (*Id.* at 8; Coy Aguilar Decl. at ¶ 3, 14.), raises sufficient doubts as to the propriety of the Mexican judgment, such that this Court cannot say that it is satisfied that the Mexican judgment was not obtained by fraud. *ABD Alwakhad,* 2005 WL 2266662, at *3. Thus, we find that Bell has met its burden of presenting evidence of fraud under the Delaware case law addressing the issue. *See id.* Because we are not satisfied that the Mexican judgment was not obtained by fraud, we will not enforce the Mexican judgment under the UFMJRA. Bell's Motion for Summary Judgment is, therefore, granted.

An appropriate Order follows.

### ORDER

**AND NOW,** this 29th day of May, 2009, in consideration of the Motion for Summary Judgment filed by Bell Helicopter Textron Inc. ("Bell"), and the Motion to Strike filed by Transportes Aereos Pegaso, S.A. de C.V. ("Pegaso"), along with the responses thereto, it is hereby **ORDERED** as follows:

(1) Plaintiff Pegaso's Motion to Strike the Affidavits of Miguel Angel Hernandez–Romo Valencia, Jorge Enrique Hernandez Marin, Tim J. Harrington, Julio Isidro Santos Coy Aguilar, and Pablo Hernandez–Romo Valencia (Doc. No. 21) is **GRANTED IN PART** and **DENIED IN PART** as set forth in the attached Memorandum.

(2) Defendant Bell's Motion for Summary Judgment (Doc. No. 10) is **GRANTED.**